United States District Court
Southern District of Texas
ENTERED

JUN 1 8 2008

Michael N. Milby, Clerk of Court
By Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 1 8 2008

Michael N. Milby, Clerk of Court

§
GERARDO GONZALEZ,                          §
    Plaintiff,                         §
                                       §
v.                                         §       Civil Action No. B-06-196
                                       §
UNITED STATES OF AMERICA and               §
M/V SBX (SEA-BASED X-BAND RADAR            §
PLATFORM).                                 §
    Defendants.                        §

## MEMORANDUM OPINION AND ORDER

I.    APPLICABILITY OF THE LONGSHOREMEN AND HARBOR WORKERS
     COMPENSATION ACT

Plaintiff Gerardo Gonzalez ("Gonzalez") filed negligence and seaworthiness claims against

the Defendant United States pursuant to the Suits in Admiralty Act. (Docket No. 1). Gonzalez

asserts that the United States, as owner of the vessel SBX-1, is liable for injuries incurred by

Gonzalez while working aboard the SBX-1. (*Id.*) The Suits in Admiralty Act permits a worker

injured on a Government-owned vessel to sue the United States based on the duties owed by a

privately-owned vessel to workers. 46 U.S.C. § 30903(a). The Longshoremen and Harbor Workers

Compensation Act ("LHWCA") provides protection for persons "engaged in maritime employment,

including any longshoreman or other person engaged in longshoring operations, and any harbor-

worker including a ship repairman, shipbuilder, and ship-breaker . . ." 33 U.S.C. § 902(3). The

LHWCA excludes from recovery any "master or member of any crew of any vessel." *Id.* at §

902(3)(g). These crewmen may instead only seek recovery under the Jones Act. *Harbor Tug &*

*Barge Co. v. Papai*, 520 U.S. 548, 553 (1997). The LHWCA and the Jones Act are mutually

exclusive and permit different claims. *Id.* (citing *Chandris, Inc. v. Latsis*, 515 U.S. 347, 355-56 (1995)).

Gonzalez's injuries occurred while the SBX-1 was at sea in March of 2005. (Docket No. 1). This created a scenario where Gonzalez, clearly otherwise considered an employee covered by the LHWCA, could possibly be considered a seaman subject to the Jones Act.  For the reasons that follow, however, this Court finds that the LHWCA governs Gonzalez's claims. The Complaint sets out claims of negligence and seaworthiness, but makes no mention as to whether these claims are governed by the LHWCA or the Jones Act.[1]  (*Id.*)  The Government's Motion for Summary Judgment construed the Complaint as asserting claims under the LHWCA.  (Docket No. 21, 22). The Government addressed Gonzalez's allegations based on the three duties owed by vessels to workers under the LHWCA. (*Id.*)  The summary judgment motion also asserted that Gonzalez's claim of unseaworthiness was barred by the LHWCA.  (*Id.*)  A seaworthiness claim is available when suing under the Jones Act, but not when suing under the LHWCA. *See* 33 U.S.C. § 905(b) (barring a claim of seaworthiness under the LHWCA); *Miles v. Apex Marine Corp.*, 498 U.S. 19, 28-30 (1990) (permitting a claim of seaworthiness under the Jones Act).

Gonzalez's response to the Government's summary judgment motion only addressed the duties of a vessel under the LHWCA. (Docket No. 27).  The response did not mention of the Jones Act.  (*Id.*)  Gonzalez made no defense of his seaworthiness claim. (*Id.*)  This Court finds that Gonzalez has conceded that the LHWCA is applicable to this action and that the record on summary judgment does not otherwise support the application of the Jones Act to Gonzalez's claims.  Thus

---

[1] The Defendant has pleaded and contended throughout the case that the LHWCA controls. The Plaintiff, while not conceding the issue, pleaded his case alternatively with the LHWCA as one of its alternatives.

the Court hereby renders judgment in the Government's favor with regard to Gonzalez's seaworthiness claim.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The nonmoving party must go beyond the pleadings and provide specific facts showing that there is a genuine issue for trial.  *Id.* at 56(e)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case. *Celotex*, 477 U.S. at 322-23.

The court should not, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.  *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).  The nonmoving party's burden is not satisfied simply by creating some metaphysical doubt as to the material facts or by providing only conclusory allegations, unsubstantiated assertions or a scintilla of evidence.  *Id.* (citations omitted). A court will resolve factual controversies in favor of the nonmoving party "only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id.*

3

III.    A VESSEL'S DUTIES AFTER *SCINDIA STEAM NAVIGATION CO. v. DE LOS SANTOS*

The Supreme Court set out a vessel's duties under the LHWCA in *Scindia Steam Navigation Co. v. De Los Santos*. *See generally* 451 U.S. 156 (1981); *see also Hill v. Texaco*, 674 F.2d 447, 451 (5th Cir. 1982) (holding the *Scindia* duties applicable to all independent contractors and employees covered by the LHWCA). The primary responsibility for the safety of a ship repair worker or a shipbuilder rests with his employer, the independent contractor ("contractor") hired to perform the ship repair or shipbuilding task. *See Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 15 (5th Cir. 1992) (citing *Randolph v. Laeisz*, 896 F.2d 964, 970 (5th Cir. 1990)); *see Futo v. Lykes Bros. S.S. Co., Inc.*, 742 F.2d 209, 213 (5th Cir. 1984). In this case, Gonzalez was employed by Isidoros Welding Service to provide pipefitting services aboard the SBX-1. During the sea trial, Gonzalez was employed to perform similar services as part of the AmFELS Engineering Department.

Contractors have the primary responsibility for their employees' safety, and as such, must avoid exposing their employees to unreasonable hazards. *Moore v. Angela M/V*, 353 F.3d 376, 380 (5th Cir. 2003) (citing *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 98 (1994)); *see Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 170 (1981); *Futo*, 742 F.2d at 213 (citing *Helaire v. Mobil Co.*, 709 F.2d 1031, 1036 (5th Cir. 1983)). The Fifth Circuit has recognized certain duties a vessel has under *Scindia* with regard to a contractor's employees, even though the contractor bears the primary responsibility for its employees' safety. *Moore*, 353 F.3d at 380 (citing *Howlett*, 512 U.S. at 98); *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1245 (5th Cir. 1997). These include: (i) the turnover duty; (ii) the active control duty; and (iii) the duty to intervene. *Moore*, 353 F.3d at 380.

4

The turnover duty relates to the condition of the ship upon the commencement of the contractor's operations. *Moore*, 353 F.3d at 380. The vessel owner must exercise ordinary care to turn over the ship and its equipment in a condition such that an expert and experienced contractor can carry on its operations with reasonable safety. *See Howlett*, 512 U.S. at 98 (quotations omitted). A vessel owner has "active control" over an area of the ship and retains primary responsibility for the safety of workers in that area if: (1) the vessel's crew retained substantial control over the area; or (2) the vessel's crew substantially interfered, by invitation or otherwise, with the contractor's exercise of exclusive control by actively intervening in the area. *Davis v. Portline Transportes Maritime Internacional*, 16 F.3d 532, 541 (3d Cir. 1994); *see Scindia*, 451 U.S. at 167; *Manuel v. Cameron Offshore Boats, Inc.*, 103 F.3d 31, 34 (5th Cir. 1997) (holding vessels retain primary responsibility for safety in "areas and equipment over which the vessel's crew retains operational control"); *Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 16 (5th Cir. 1992) (citing *Turner v. Costa Line Cargo Services, Inc.*, 744 F.2d 505, 512-13 (5th Cir. 1984)); *Cook v. Exxon Shipping Co.*, 762 F.2d 750, 752 (9th Cir. 1985) (finding a contractor who provided direct supervision and orders to a contractor and its employees demonstrated active control). The duty to intervene attaches only when the vessel owner has actual knowledge that a dangerous condition exists and that the contractor, in the exercise of obviously improvident judgment, cannot be relied upon to remedy the condition. *Greenwood*, 111 F.3d at 1248 (citing *Scindia*, 451 U.S. at 175); *Pimental*, 965 F.2d at 17 (citing *Randolph v. Laeisz*, 896 F.2d 964, 971 (5th Cir. 1990)).

IV.     SUMMARY JUDGMENT EVIDENCE

A.     The SBX-1 Project

This action involves an injury sustained by Gonzalez during the March 2005 sea trial of the SBX-1. (Docket No. 1). The SBX-1 is a twin-hulled, semi-submersible vessel developed for the United States' Ground-Based Midcourse Defense ("GMD") program. (United States Motion for Summary Judgment, Exhibit 3, Declaration of Darren Harvey [hereinafter Harvey Decl.] at ¶ 2). The SBX-1 is a converted oil platform equipped with an X-band radar system to identify and monitor incoming ballistic missiles and decoys. (Gonzalez's Response to the United States Motion for Summary Judgment, Ex. B., Deposition of Darren Harvey [hereinafter Harvey Dep.] at 32). The SBX-1 and GMD program are under the direction of the Missile Defense Agency ("MDA"), part of the United States Department of Defense. (Harvey Decl. at ¶¶ 1-3).

The MDA awarded the Boeing Company ("Boeing") a contract to build the SBX-1 and oversee the development of the sea-based radar system. (Harvey Decl. at ¶ 4). Boeing serves as the prime contractor for the SBX-1 contract. (*Id.*) As the prime contractor, Boeing supervises, controls, and operates the platform during the development of the SBX-1. (Harvey Dep. at 79, 108). The Government owns the SBX-1, but has not assumed any direct or indirect operational control over the construction or management of the platform. (*Id.*); (Harvey Decl. at ¶¶ 6-7).

Boeing subcontracted the SBX-1 shipbuilding and conversion work to AmFELS. (Harvey Decl. at ¶ 4). AmFELS and its subcontractors performed this work at the AmFELS shipyard in Brownsville, Texas. (*See id.*) Apart from Boeing and AmFELS, a number of other contractors and subcontractors were also involved in the construction of the SBX-1 and its related radar system. (Harvey Dep. at 52-53). AmFELS subcontracted the welding, pipefitting and ballasting work on SBX-1's column and pontoon areas to Isidoros Welding Service ("IWS"). (Harvey Decl. at ¶ 4).

Each pontoon is approximately 350 feet in length and approximately 20-25 feet deep. (Harvey Dep. at 60-61).

        B.    <u>Gonzalez's Work on the SBX-1 at the AmFELS Shipyard in Brownsville, Texas</u>

Gonzalez began working for IWS in 2002 as a pipefitter and supervisor. (Gonzalez's Response to the United States Motion for Summary Judgment, Ex. B., Deposition of Gerardo Gonzalez [hereinafter Gonzalez Dep.] at 23-31). AmFELS managers supervised him during all of his projects for IWS, including his work on the SBX-1. (*Id*. at 32, 35). Gonzalez never reported to anybody employed by the United States for any reason. (*Id*. at 35); (Harvey Decl. at ¶¶ 7-8).

Gonzalez worked on the SBX-1 for approximately five to six months. (Gonzalez Dep. at 33-34). The majority of this time was spent as a pipefitter in the pontoons and columns of the SBX-1 during the time the vessel under construction at the AmFELS shipyard. (*Id*.) A helper and welder assisted Gonzalez with his work. (*Id*. at 35). Gonzalez held daily Job Safety Analysis ("JSA") meetings for his crew to discuss what they would be working on during the day. (*Id*. at 34-35). At the end of each work day, Gonzalez was responsible for cleaning up his work space to make sure the space was ready for the next shift. (*Id*. at 41-42). This required him to sweep the area, but not mop. (*Id*. at 42).

Once a week, AmFELS held a general safety meeting for a large group of workers on the SBX-1. (Gonzalez Dep. at 35-36). The level of safety precautions aboard the SBX-1 increased as the work on the platform progressed. (*Id*. at 37). If Gonzalez saw anything unsafe, he was to report the condition to AmFELS and people on the platform. (*Id*. at 35, 37). Gonzalez often referred to "people from the platform" during his deposition, but he could not identify their actual employer. (*Id*. at 36). Gonzalez also testified that increasing numbers of "people from the government" began

7

working on the platform while the SBX-1 was at the AmFELS shipyard. (*Id.* at 36-37). Gonzalez had no interaction with these individuals and could not testify whether anyone from the government attended the general safety meetings, because he could not tell if people were from the government or not. (*Id.* at 37).

  C. MDA Liaisons

  As part of his deposition, Darren Harvey testified generally, as a representative of the MDA, and specifically, as one of the two MDA liaisons aboard the SBX-1 for the March 2005 sea trial during which Gonzalez was injured. (*See* Harvey Dep. at 31). Harvey was a project engineer and MDA liaison for the SBX-1 based out of Huntsville, Alabama from 2004 through early 2006. (*Id.* at 31, 76). MDA liaisons visited various spaces on the SBX-1, observed sea trials, and attended SBX-1 project meetings to keep the Huntsville-based GMD X-Band Radar Project Office leadership apprised of the development of the SBX-1. (Harvey Decl. at ¶ 3). This required MDA liaisons to make periodic visits to the AmFELS shipyard. (Harvey Dep. at 35-37). At any given time, the Government would have one or two MDA liaisons present at the AmFELS shipyard to monitor the execution of the contract. (*Id.* at 38, 91).

  Boeing conducted daily coordination meetings with its subcontractors and Boeing safety personnel. (Harvey Dep. at 45, 80). These meetings would typically involve ten or fewer people. (*Id.* at 45). MDA liaisons would observe these meetings so they would know generally what work was taking place on the SBX-1. (*Id.* at 42-45). Boeing rarely asked the MDA liaisons what they thought about the work occurring on the vessel. (*Id.* at 91). These liaisons exercised no supervision or control over the shipbuilders or contractors at any time during the SBX-1 project. (Harvey Decl. at ¶ 7). They also did not provide any instructions or orders to any AmFELS' employees or

subcontractors during that time. (*Id.*) If the Government had a problem with the execution of the SBX-1 contract, requests for changes had to go through the MDA contracting officer in Huntsville. (*See* Harvey Dep. at 46). The contracting officer monitored the specific details of the contract and how they were being performed. (*Id.* at 47).

Harvey had to attend a three-to-four day general industrial and shipboard safety training held by AmFELS and Boeing before he was allowed to board the SBX-1. (Harvey Dep. at 49). He had also previously received training on shipboard safety as part of his officer's training with the Navy. (*Id.* at 17). Once aboard the SBX-1, Harvey attended safety meetings if a specific activity required additional precautions, such as entering a confined space that had been sealed for a long time. (*Id.* at 50). Harvey's participation in these meetings was voluntary. (*Id.* at 51). He had no input at these meetings. (*Id.*) The Government played no specific role in safety aboard the SBX-1 apart from the general premise that 'any individual aboard a ship is responsible for reporting unsafe conditions.' (*Id.* at 51, 80).

While aboard the SBX-1, Harvey would walk around the platform to observe the work that was occurring so he could keep MDA leadership up-to-date on the development of the SBX-1 (Harvey Decl. at ¶ 3); (Harvey Dep. at 39-40, 44, 48). During the daily coordination meetings Harvey learned what work had been completed on the ship during the previous day and what work was being performed on the current day. (*See id.* at 44-45). Harvey often looked for this ongoing or completed work during his daily walkthrough of the SBX-1. (*Id.*)

D.      The March 2005 Sea Trial

1.Harvey and the MDA's Role During the March 2005 Sea Trial

In March 2005, Boeing conducted a sea trial of the SBX-1 as part of its management of the project. (Harvey Decl. at ¶ 4). For the sea trial, Boeing delegated its ship management responsibilities to a subcontractor, Interocean American Shipping Company. (*Id.*) At no time did the MDA accept the SBX-1 or assume any direct or indirect operational control over the SBX-1 from Boeing or any other contractors building the vessel. (*Id.* at ¶ 6); (*but see* Gonzalez Dep. at 57) (testifying that after the SBX-1 left Brownsville it had been delivered to the Government because he knew AmFELS did not operate vessels). Boeing oversaw the testing of the SBX-1 during the sea trial. (Harvey Dep. at 83-84).

As part of the sea trial, the SBX-1 traveled from the AmFELS shipyard in Brownsville to Corpus Christi, Texas so that the X-band radar system could be installed. (Harvey Dep. at 55). The SBX-1 was not considered to be finished during this sea trial, though the self-propulsion system had been completed. (*Id.* at 57-58). Harvey and Danny Pollard were the MDA liaisons aboard the SBX-1 for this sea trial. (Harvey Decl. at ¶ 7). The Government knew the test plan for the SBX-1 during the sea trial, but had MDA liaisons aboard the SBX-1 for the sea trial only to make observations. (Harvey Dep. at 62, 98-99).

During the sea trial, Harvey tried to walk as many spaces in the vessel as he could each day, including walking the length of the pontoons and going into the pump rooms. (Harvey Dep. at 60-63). Harvey did this in an attempt to observe the work and testing occurring on the SBX-1. (*Id.* at 63-64). In some situations, Harvey may have had the expertise to know if something was amiss, however, he lacked the technical skills to know whether every piece of equipment on the SBX-1 was performing property. (*Id.* at 64-65).

10

While in the pontoons, Harvey saw people working on equipment and checking valves. (Harvey Dep. at 61-62). The workers may have been employed by Boeing or one of its subcontractors, but Harvey could not distinguish as to which employees worked for which contractor. (*Id.* at 62-63). Harvey remembered seeing approximately five workers in the pontoons at any given time. (*Id.* at 74). The valves were being checked as part of monitoring the ship's systems to make sure that the SBX-1 was running safely. (*Id.* at 62). Some of the valves used hydraulic fluid or oil. (*Id.* at 66). Neither Harvey nor Pollard had any input into when the valves were checked or what valves were checked. (*Id.* at 62); (*see* Harvey Decl. at ¶ 7).

Harvey recalled seeing equipment on the other side of rails in the pontoons that workers would have had to access. (Harvey Dep. at 82). He did not recall ever having to step over or onto a rail or seeing any worker step over or onto a rail to access equipment. (*Id.* at 82-83). Harvey was not sure if there were other openings that could have been used to access the equipment rather than stepping onto or across the rails. (*Id.*)

The pontoons were typically wet, but that condition was not unusual for an area on the bottom of a ship. (Harvey Dep. at 66). Harvey saw hydraulic fluid collected around the valves in the pontoons, but he never saw any hydraulic fluid drip from any valves. (*Id.* at 67, 71-72). He could not recall where specifically he saw hydraulic fluid, except around some of the valves. (*Id.* at 75). Harvey remembered hearing about hydraulic fluid as part of housekeeping meetings that were held to make sure contractors were keeping the vessel clean. (*Id.* at 68).

Harvey saw people wipe up hydraulic fluid around the valves. (Harvey Dep. at 69, 71). He thought they worked for Boeing, but could not distinguish Boeing employees from other contractors'

11

employees aboard the SBX-1. (*Id*. at 69-70). Harvey could not recall a time where there was a significant amount of hydraulic fluid and somebody was not cleaning it up. (*Id*. at 71).

Harvey knew that hydraulic oil could cause a safety hazard. (Harvey Dep. at 68). He would have reported significant amounts of hydraulic fluid to Boeing if he had observed such a condition. (*Id*. at 65, 69-70). No MDA liaison, including Harvey or Pollard, observed or knew about any safety hazards in the pontoons, including any hazards created by spilled or leaking hydraulic fluid. (*Id*. at 65-66, 107); (Harvey Decl. at ¶ 8-9). None of the contractors aboard the SBX-1 ever advised any MDA liaison of any hydraulic oil spill or leakage hazard in the pontoons. (*Id*. at ¶ 8). The MDA had no reason to believe the pontoon area was dangerous or posed an unreasonable hazard to workers on the vessel. (*Id*. at ¶¶ 6, 9).

### 2.   Gonzalez's Work During the Sea Trial

During the sea trial, Gonzalez worked for the AmFELS engineering department. (Gonzalez Dep. at 54). His duties included checking the operation of valves in the platform columns and pontoons, putting oil on panels and removing paper in areas that had been painted. (*Id*. at 43-44, 46-47, 64, 77-78). Gonzalez testified that "government people" were running the platform during the sea trial and providing him with orders. (*Id*. at 47). Neither AmFELS nor people operating the platform held safety meetings during the sea trial. (*Id*. at 81).

Gonzalez often referred to "government people" when testifying about the March 2005 sea trial. (*See, e.g.,* Gonzalez Dep. at 48). He testified that he used the term "government people" because he knew AmFELS was not operating the SBX-1 during the sea trial. (*Id*.) Based on this deposition testimony, Gonzalez appears to define his use of "government people" as referring to any

12

non-AmFELS employee rather than an indication of specific knowledge as to whether a particular employee worked for the Government or one of the other contractors aboard the SBX-1.[2]

Given the location of the pontoon at the bottom of the boat, the pontoon area was generally moist and slippery. (Gonzalez Dep. at 78). Gonzalez had to be careful walking in the pontoons at all times because of the slippery nature of the work area. (*Id.* at 79). The presence of hydraulic fluid was normal around hydraulic equipment in operation. (*Id.* at 78). A small amount of hydraulic fluid covering a beam or rail in the pontoons could not be distinguished from the normal moisture that would cover a beam. (*Id.* at 80). It was not normal for there to be a lot of hydraulic fluid in the pontoons. (*Id.* at 79-80). If hydraulic fluid was present, someone had not properly cleaned the area. (*Id.*) Gonzalez thought "the people from the rig, the government" were responsible for cleaning the

---

2

| | | |
|---|---|---|
| A. | | Where the accident happened [during the seal trial], we were just working to verify that the valves were opening. |
| Q. | | Okay. |
| A. | | That's what we were verifying. Because the government people were the ones who would give the orders, the ones who would – were already running the platform. |
| Q. | | You say government people were running the platform and giving the orders. Who were they giving orders to? |
| A. | | Well, it's very different from when the platform's in the shipyard and when it goes out to sea. Then you don't have enough people anymore, like safety. When it goes out to sea, the platform is then run by other people, the people that run the platform. It's not being run by people like AmFELS anymore. When the platform goes out, the work is done with regard to tests that have to be done, such as how much the platform will – how far the platform will submerge, the capacity of the equipment that's running. |
| | | . . . |
| Q. | | And when you say the government people were running the platform, how did you know that they were government people? |
| A. | | I say that they were government people, because AmFELS people were not operating it. AmFELS never operates platforms. They fabricate them, they repair them, but they never operate them. |
| Q. | | So somebody other than AmFELS was operating the – testing the platform when it was away from the shipyard; is that right? |
| A. | | Correct. |

(Gonzalez Dep. at 47-48).

pontoons as cleaning the area was not his job. (*Id.* at 79). Gonzalez never reported any hazardous conditions in the pontoons to MDA representatives. (Harvey Decl. at ¶ 8).

        3.    The Accident

Gonzalez began work on March 14, 2005 at 6:00 a.m. (Gonzalez Dep. at 49). That morning, he reported to Joe Molina ("Molina"). (*Id.* at 54). It is unclear from Gonzalez's deposition whether Molina worked for IWS or AmFELS. (*See id.*) Molina assigned Gonzalez and a second IWS worker, Hilario Bautista ("Bautista)" to help check the operation of valves as part of a test of the SBX-1. (*Id.* at 50). Molina sent them to a specific part of the ship to meet by two people from the platform. (*Id.* at 55, 62). Gonzalez referred to these people as being "from the government, the ones running the platform . . . ." (*Id.* at 49, 61). Gonzalez did not know the names of these two people because they spoke English and he did not. (*Id.* at 61). Bautista served as the translator between Gonzalez and the two men. (*Id.* at 50, 61).

People on the main deck of the SBX-1 radioed orders to check certain valves to the two other men in the pontoons with Gonzalez and Bautista. (Gonzalez Dep. at 62). These individuals then relayed the orders to Gonzalez through Bautista so Gonzalez could identify the correct valve. (*Id.* at 63-64). Gonzalez thought the initial radio order from the deck also came from "government people on the platform, government personnel." (*Id.* at 55). He thought the "people on the platform" directed his work, because those same individuals were responsible for conducting the ballasting tests which involved submerging and raising the vessel. (*Id.*)

Gonzalez worked from 6:00 a.m. until 9:00 p.m. on March 14, 2005. (*See* Gonzalez Dep. at 49, 65). He then returned to work three hours later at 12:00 a.m. on March 15, 2005. (*Id.* at 69). Gonzalez was injured at approximately 4 a.m. on March 15, 2005. (*Id.* at 49). Gonzalez testified

he had only two hours sleep between starting work on March 14, 2005 and the time of his accident. (*Id.* at 67).

At the time of the accident, Gonzalez had been ordered to check a certain valve. (Gonzalez Dep. at 68). He was wearing a hard hat, goggles, steel-toed boots and his work clothing. (*Id.* at 49). The valve was beneath the bottom deck and accessible only by handrails. (*Id.* at 68). There was a 36-inch beam between Gonzalez and the valve . (*See id.*) Gonzalez crossed the handrails and stepped on the beam to access the valve. (*Id.*) After stepping on the beam, he let go of the handrails. (*Id.*) Gonzalez slipped and fell backwards, striking his head on the beam. (*Id.*) He asserts a thin layer of hydraulic oil on the beam made the beam slippery. (*Id.* at 78-80). Since the layer of hydraulic fluid was thin, the fluid was clear and could not be seen. (*Id.* at 78-79).

Gonzalez had worked in the area where he was injured many times while the SBX-1 was at the AmFELS shipyard and a few times during the sea trial. (Gonzalez Dep. at 57, 78). The lighting was very good in the area of the accident. (*Id.* at 101). No one told Gonzalez about any dangerous conditions relating to hydraulic fluid on the beams or a leakage of fluid from the valves. (*Id.* at 99-100). Gonzalez did not see anyone clean up the oil after he slipped and fell. (*Id.* at 101).

Gonzalez's hard hat took the entire impact of the fall on his head. (Gonzalez Dep. at 68) His leg became stuck as a result of his fall. (*Id.*) Gonzalez was disoriented from the impact to his head, so Bautista and the two men started to take him to his room to rest and to ice his injuries. (*Id.* at 68, 71). One of the two men went to tell others than Gonzalez had been injured. (*Id.* at 71-72). By the time Gonzalez arrived on the main deck of the SBX-1, additional people were coming to help him. (*Id.* at 72). When they reached the main deck, Gonzalez, though hurt, was able to walk. (*Id.*) He was then helped to his room. (*Id.*)

15

AmFELS Safety Inspector Jose Luis Ramirez ("Ramirez") spoke with Gonzalez about the accident soon thereafter. (Gonzalez Dep. at 70). Gonzalez does not remember if Ramirez asked him questions, but remembers having to sign a paper during his discussion with Ramirez. (*Id.* at 68). Ramirez filled out an injury report regarding Gonzalez's injuries and dated the report March 15, 2005 at 5:00 a.m. (Defendant's Response to Motion for Summary Judgment, Exhibit B [hereinafter AmFELS Injury Report]). Gonzalez disagrees with the date on the report and testified that the report was not made until several days later, after Gonzalez returned to land. (*Id.* at 85-87). The AmFELS injury report included  Ramirez's documentation of the incident and injury, a written signed statement by Gonzalez in Spanish, and a translation of that statement into English. (AmFELS Injury Report). The report indicated an injury to Gonzalez's right knee and shin. (*Id.*)

The report differs from Gonzalez's account of the accident in two ways. The report states that Gonzalez removed a deck plate to perform the inspection of the valve. (AmFELS Injury Report). Gonzalez testified that he did not remove the deck plate and does not know why the report mentions the deck plate. (Gonzalez Dep. at 52, 85). Further, the injury report, including Gonzalez's signed written account of the accident, makes no mention of the beam being slippery or the presence of hydraulic fluid on the beam. (AmFELS Injury Report). At one point in his deposition, Gonzalez testified that he forgot to mention the hydraulic fluid when speaking with Ramirez. (Gonzalez Dep. at 85). Later in his deposition, he testified that while meeting with Ramirez after the accident, he told Ramirez that he had slipped on an oily beam. (*Id.* at 101).

Gonzalez was given pain pills and rested for approximately two hours. (Gonzalez Dep. at 69, 72). After those two hours, Gonzalez decided to return to work. (*Id.* at 72, 74-76). Gonzalez worked until later in the afternoon. (*Id.*) He did not return to checking valves, either because he was

not allowed or that testing had been completed. (*Id.* at 72-73). For the rest of the sea trial, Gonzalez

worked on other tasks, including removing paper from the engine room after it had been painted.

(*Id.* at 73). He testified there were days during the sea trial where, because there was no work to do,

he remained on standby doing absolutely nothing. (*Id.*) Gonzalez did not begin to experience further

problems with his knee until he returned to land. (*Id.* at 70). He testified that the pain in his knee

prevented him from working. (*Id.*)

V.     DISCUSSION

      A.     Turnover Duty

Gonzalez presents no factual basis on which this Court could find that the Government

violated the turnover duty. The Government's Motion for Summary Judgment on Gonzalez's

turnover duty claim is **GRANTED**.

      B.     Active Control Over SBX-1

Gonzalez asserts that the Government had active control over the entire vessel during the sea

trial and was, thus, potentially liable for injuries occurring aboard the SBX-1 during that time. The

mere presence of the representatives of a vessel aboard a ship to inspect the work being completed

and check on the progress of the contractor's work does not trigger the active control duty. *Fontenot

v. United States*, 89 F.3d 205, 208 (5th Cir. 1996); *Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209, 211

(5th Cir. 1984); *see West v. United States*, 361 U.S. 118, 119-20 (1959). The presence of Harvey

and Pollard aboard the SBX-1 to observe the development of the ship, is, therefore, insufficient to

show that the Government had control over the SBX-1. According to the Government, during the

sea trial, Interocean American Shipping Company was responsible for the managing the SBX-1.

(Harvey Decl. at ¶ 4).

17

Gonzalez bases this active control claim on his own testimony that "[t]he day we went out

to sea to work . . . the platform did not return any longer, anymore to AmFELS, it was delivered then

to the Government." (Gonzalez Dep. at 57). Gonzalez provides no documentation or other evidence

to support this statement. His testimony boils down to an unsupported premise based upon pure

speculation that if AmFELS was not in control, the Government must have been in control. *See*

*supra* note 1. This conclusory allegation and unsubstantiated assertion does not satisfy Gonzalez's

burden on summary judgment. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1974).

This court may not assume that Gonzalez will provide the additional necessary facts to support this

claim at trial. *See id.* Gonzalez failed to provide this Court with specific facts to show that there is

a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court is

to resolve factual controversies in favor of the nonmoving party "only when there is an actual

controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37

F.3d at 1075.    Absent such facts, this Court finds that summary judgment in favor of the

Government is appropriate on Gonzalez's claim that the Government had active control of the SBX-

1 during the sea trial.

C.    Active Control Over Safety Aboard the SBX-1

Gonzalez also asserts that the Government had active control over safety on the SBX-1. This

assertion is based on the testimony of Darren Harvey that, as a general premise, each person aboard

a ship has a duty to report any dangerous condition observed by that person. (*See, e.g.*, Harvey Dep.

at 109). Essentially, Gonzalez asks this Court to find that since Harvey was walking about the ship

and had a duty, no different than the duty of every other individual aboard the SBX-1, to report

dangerous conditions, this establishes the Government's active control over safety aboard the SBX-1. Since the mere presence of a Government representative aboard a ship is insufficient to establish active control, this general premise cannot, by itself, satisfy Gonzalez's need to raise an issue of fact to counter the Government's Motion for Summary Judgment. *See Fontenot v. United States*, 89 F.3d 205, 208 (5th Cir. 1996); *Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209, 211 (5th Cir. 1984); *see also West v. United States*, 361 U.S. 118, 119-20 (1959). Gonzalez presents no other evidence to support his proposition that the Government had active control of safety aboard the SBX-1. He has, thus, failed to carry his burden on summary judgment as to this active control claim.

      D.     <u>Active Control Over Gonzalez's Work</u>

      Gonzalez further asserts that the Government was directing his work during the day he was injured. This assertion is based on Gonzalez's testimony that he received radio orders from "government people" directing his work in checking valves the day of his accident. (Gonzalez Dep. at 55, 61-62). He also stated that two people "from the government" were present with him and Bautista while they were checking the valves. (*Id*. at 61, 71). Just before this point in his deposition, Gonzalez testified that he referred to individuals as "government people" only because he knew that they were not working for AmFELS. (Gonzalez Dep. at 48). Gonzalez would, thus, appear to define any reference to "government people" as simply a reference to any non-AmFELS employee.

      In addition to AmFELS, Boeing and several other contractors and subcontractors were involved in the construction of the SBX-1 and had a number of employees aboard the SBX-1 during the sea trial. (*See generally* Harvey Dep.); (Gonzalez Dep.) Some of these contractors and subcontractors in the pontoons during the sea trial working on equipment and checking valves.

(Harvey Dep. at 61-63). Harvey could not tell whether all of the employees worked for Boeing, or whether some employees may have worked for subcontractors. (*Id.*)

Harvey testified that Boeing was responsible for the testing of the SBX-1 during the sea trials. (Harvey Dep. at 83-84). Neither Harvey nor Pollard exercised any supervision or control over the shipbuilders during the sea trial, nor at any other time during the SBX-1 project. (Harvey Decl. at ¶ 7). They provided no instructions or orders to any AmFELS employees or subcontractors regarding the work being performed during the sea trial. or at any time during the SBX-1 project. (*Id.*) During the testing of the SBX-1, Harvey served in an observation role only. (Harvey Dep. at 98-101).

During his deposition, Harvey was asked a question about Gonzalez's references to "government people" directing his actions:

> Q.   [Gonzalez] in his deposition . . . testified that during this particular sea trial, he remembers two government, you know, guys being on the – on the platform or on the radar and involved in this testing process. He remembers them having a presence there. You don't remember if you were one of those guys? He remembers two of them being there. Do you remember if you were one of those people?
>
> A.   I might have been.

(Harvey Dep. at 98-101). This question does not ask specifically whether Harvey was involved in directing Gonzalez's work the day of Gonzalez's accident, but rather asks a muddled question that could go to either the presence of Harvey aboard the SBX-1 during the sea trial or whether he had any role in the testing process whatsoever. (*See id.*) The follow-up questions focused on Harvey's presence on the SBX-1, not any alleged interaction with Gonzalez. (*Id.*)

Gonzalez has presented the following situation: two non-AmFELS employees were relaying information to Gonzalez and Bautista as to which valves to check. Gonzalez, himself, limited the probative value his testimony as to these individuals being "government people" by defining that term to broadly include all non-AmFELS employees. There were a number of other contractors aboard the SBX-1 during the sea trial and the Government has expressly denied any involvement in giving instructions or directions to any AmFELS employees or any employees of contractors during the sea trial. Like his initial active control claim, this claim is also based on conclusory allegation and unsubstantiated assertions. That Gonzalez's deposition created a possibility that a non-AmFELS employee directed his work, and Harvey was among the many other employees aboard the SBX-1 who fit into that broad category, is, at best, a scintilla of evidence that does not satisfy Gonzalez's burden on summary judgment. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). This court may not assume that Gonzalez will provide the additional necessary facts to support this claim at trial. *See id.* Absent such facts, this Court finds that summary judgment in favor of the Government is appropriate on Gonzalez's claim that the Government had active control over Gonzalez's work the day he was injured.

Gonzalez has failed to present a genuine issue for trial as to any of his active control duty claims. The Government's Motion for Summary Judgment on Gonzalez's active control claims is **GRANTED**.

E.   Duty to Intervene

After control over an area of the vessel has been turned over to an independent contractor, whether any condition in that area poses an unreasonable risk of harm to the safety of the contractor's employees is a judgment initially left to the contractor. *Scindia Steam Nav. Co., Ltd.*

21

*v. De Los Santos*, 451 U.S. 157, 175-176 (1981). The vessel may rely on the expertise and of the contractor and assume that the contractor considers that a "condition, though dangerous, [is] safe enough." *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1249 (5th Cir. 1997) (citing *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1039 n.12 (5th Cir. 1983)); *Randolph v. Laeisz*, 896 F.2d 964, 971 (5th Cir. 1990); *Pledger v. Phil Guilbeau Offshore, Inc.*, No. Civ. A. 02-1796, 2003 WL 2012382, at *4-5 (E.D. La. May 1, 2003). "[I]n many cases it will be perfectly reasonable for the shipowner to assume that the [contractor] will correct the defect." *Scindia*, 451 U.S. at 176. A shipowner, thus, has no duty to supervise or inspect a contractor's work to discover dangerous conditions that may develop during the course of its operations. *Id.* at 172; see *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 100-01 (1994). The vessel may not be not held to a duty to discover the condition or to anticipate its danger.[3] *Helaire*, 709 F.2d at 1038-39; *see Lormand v. Superior Oil Co.*, 845 F.2d 536, 543 (5th Cir. 1987) (holding that *Scindia* imposes no duty on a vessel to monitor a contractor's operations for the development of hazardous conditions). The duty to intervene arises only after the vessel has actual knowledge that the contractor's decision to continue work in the face a dangerous condition is "so obviously improvident" that it presents "an unreasonable risk of harm" to the contractor's employees.[4] *Scindia*, 451 U.S. at 175-76.

---

[3] A plaintiff's duty to intervene claim, thus, cannot rely on a theory that the vessel should have supervised, inspected or monitored a contractor's work. *See Howlett*, 512 U.S. at 99-100; *Elberg v. Mobil Oil Corp.*, 967 F.2d 1146, 1151 (7th Cir. 1992); *Bjaranson v. Botelho Shipping Corp., Manila*, 873 F.2d 1204, 1209 (9th Cir. 1989).

[4] The duty to intervene does not extend to an open and obvious transitory condition that is created entirely by the contractor, in an area under the contractor's control and relates wholly to the contractor's own gear and operations. *Fontenot v. McCall's Boat Rentals, Inc.*, No. 05-311005, 227 Fed. Appx. 397, 405 (5th Cir. 2007) (citing *Futo v. Lykes Bros. S.S. Co., Inc.*, 742 F.2d 209, 216 (5th Cir. 1984); *Romero v. Cajun Stabilizing Boats, Inc.*, 501 F. Supp. 2d 816, 824 (W.D. La. 2007).

The Fifth Circuit has characterized the duty to intervene as requiring: (i) actual knowledge of a dangerous condition that posed an unreasonable risk of harm; and (ii) actual knowledge that the contractor cannot be relied on to remedy the condition or protect its employees and that the contractor is instead, in the exercise of obviously improvident judgment, continuing work in the face of an unreasonably dangerous condition.[5] *See Fontenot v. McCall's Boat Rentals, Inc.*, No. 05-31005, 227 Fed. Appx. 397, 404-05 (5th Cir. 2007); *Nava v. M/V Leonardo Lembo*, No. 01-21276, 2002 WL 31115121, at *1 (5th Cir. Sept. 17, 2002); *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1248 (5th Cir. 1997) (citing *Randolph v. Laeisz*, 896 F.2d 964, 971 (5th Cir. 1990)); *Romero v. Cajun Stabilizing Boats, Inc.*, 501 F. Supp. 2d 816, 824 (W.D. La. 2007).

      1.     Actual Knowledge of a Condition Posing an Unreasonable Risk of Harm

A plaintiff must provide evidence showing that the vessel was "actually aware that an unreasonable risk of harm" had been created to support a duty to intervene claim. *Randolph*, 896 F.2d at 971 (citing *Woods v. Sammisa Co., Ltd.*, 873 F.2d 842, 853 (5th Cir. 1989)); *see Greenwood*, 111 F.3d at 1249. The Fifth Circuit distinguishes between knowledge of a condition and knowledge of the dangerousness of that condition. *Randolph*, 896 F.2d at 971. Where nothing in the record demonstrates that the shipowner had any reason to suspect that the condition posed an unreasonable risk of harm, the shipowner was reasonable to rely on the expertise of the contractor to remedy the

---

[5] The duty to intervene standard requires *actual* knowledge of both the dangerous condition and the unreasonable conduct. *Williams v. M/V SONORA*, 985 F.2d 808, 813 (5th Cir. 1993); *Castorina v. Lykes Bros. S.S. Co., Inc.*, 758 F.2d 1025, 1032 (5th Cir. 1985); *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1036-37 (5th Cir. 1985); *Turner v. Costa Line Cargo Services, Inc.*, 744 F.2d 505, 510-11 (5th Cir. 1984); *Duplantis v. Zigler Shipyards, Inc.*, 692 F.2d 372, 374 (5th Cir. 1982); *Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir. 1982); *Prestenbach v. Chios Challenge Shipping and Trading S.A.*, No. Civ. A. 03-3636, 2005 WL 517445, at *6 (E.D. La. Feb. 24, 2005); *Dalleo v. River Const., Inc.*, No. Civ. A. 01-2397, 2002 WL 31296438, at *5 (E.D. La. Oct. 11, 2002). A court errs when it uses a standard that the vessel "knew or should have known" that the condition presented an unreasonable risk of harm. *Randolph v. Laeisz*, 896 F.2d 964, 971 (5th Cir. 1990); *see Dembroski v. Reliant Shipping Corp.*, Civ. No. 5-93-110, 1994 WL 903263, at *3 (D. Minn. Oct. 25, 1994) (holding that the plaintiff misinterpreted the narrow scope of the duty to intervene by trying to include liability for constructive knowledge rather than just actual knowledge).

condition or work safely in light of the condition. *Romero v. Cajun Stabilizing Boats, Inc.*, 501 F. Supp. 2d 816, 824 (W.D. La. 2007). The mere fact that a contractor had to work with caution around a certain condition "falls well short of putting the vessel . . . on notice that the [condition] created an unreasonable risk of harm . . . ." *Randolph*, 896 F.2d at 971 (citing *Woods*, 873 F.2d at 853). Where an allegedly dangerous condition involves a slippery condition created by oil or another substance, the vessel must also have actual knowledge that the contractor had not cleaned up the condition. *Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 17 (5th Cir. 1992); *see also Prestenbach v. Chios Challenge Shipping & Trading S.A.*, No. Civ. A 03-3636, 2005 WL 517445, at *9 (E.D. La. Feb. 24, 2005).

The mere presence of the vessel's representatives on the ship does not prove knowledge of a dangerous condition. *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1330 (5th Cir. 1985). While vessel's representatives may have been near the site of an accident when the injury occurred and, thus, had an opportunity to see the presence of hydraulic fluid at the time of the accident, where there is no evidence that there was a dangerous amount of fluid or that a clean up was necessary there is, at best, a weak issue of fact with respect to the vessel's actual knowledge of a dangerous condition. *Prestenbach*, 2005 WL 517445 at *8. Here, Gonzalez himself said the thin layer of hydraulic fluid was not visible, even to him.

When an allegedly dangerous crane has not caused any other accidents or complaints and the observable malfunction was not severe, there was "simply no evidence" to support a finding that the shipowners knew the crane posed an unreasonable risk of harm. *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1249 (5th Cir. 1997); *see Keller v. United States*, 38 F.3d 16, 33 (1st Cir. 1994). Where a complaint was made to the contractor, there must also be evidence that the complaint was

brought to the attention of the vessel. *Dembroski v. Reliant Shipping Corp.*, Civ. No. 5-93-110, 1994 WL 903263, at *3 (D. Minn. Oct. 25, 1994) (citing *Woods v. Sammisa Co.*, 873 F.2d 843, 853 (5th Cir. 1989)); *Wixom v. TGM Shipping Agency*, Civ. A. No. 91-1115, 1992 WL 115612, at *3 (E.D. La. May 1, 1992).

A plaintiff cannot prove a shipowner's actual knowledge of a dangerous condition by demonstrating the shipowner knew a dangerous condition previously existed in a particular area. *Pledger v. Phil Guilbeau Offshore, Inc.*, No. Civ. A. 02-1796, 2003 WL 2012382, at *4-5 (E.D. La. May 1, 2003). Where the plaintiff only presented evidence that the vessel knew potentially slippery algae had been present on the deck at a previous time and the algae had been cleaned up, the plaintiff failed to present sufficient evidence of the vessel's actual knowledge of the presence of algae at a later time when the plaintiff was injured. *Id.* The Fifth Circuit has similarly found that when a crew member walks through an area containing an alleged dangerous condition and has no concern or complaint, this "undermines any suggestion that [the vessel] knew or believed that the obstruction created an unreasonably dangerous working condition." *Fontenot v. McCall's Boat Rentals*, No. 05-31055, 227 Fed. Appx. 397, 405 (5th Cir. 2007).

The allegedly dangerous condition in this action was the presence of hydraulic fluid on a rail in the pontoons on the day of the accident. There is no allegation that the valves were faulty in leaking hydraulic fluid. In fact, both Gonzalez and Harvey testified that it was normal for hydraulic fluid to drop or come out of the valves when hydraulic equipment is in operation. The danger was, thus, created by the failure to clean up the hydraulic fluid. The responsibility for cleaning up the fluid was with Boeing, AmFELS, IWS or some other contractor aboard the SBX-1. The Government

had no duty to clean up the hydraulic fluid. The party creating the danger was, therefore, the contractors and their clean-up crews.

Regarding the Government's knowledge of the allegedly hydraulic fluid spill that Gonzalez asserts caused his injury, Harvey knew that hydraulic fluid had been collecting around the valves on prior occasions and that the hydraulic fluid had been cleaned up. Harvey's knowledge of prior conditions, particularly when those conditions had been remedied, is not evidence of actual knowledge of the specific condition that injured Gonzalez. There is no evidence that Harvey, or anyone beyond possibly Gonzalez, had knowledge of the specific hydraulic fluid spill, if it existed at all, that allegedly caused Gonzalez's injuries. As noted above, Gonzalez admitted he was not able to see or distinguish the fluid from the moisture normally present in the pontoons. The Government did not have a duty to monitor or inspect the pontoons for hydraulic fluid. Gonzalez provided no evidence that hydraulic fluid had ever caused any accidents in the pontoons. Further, there is no evidence that anyone had ever complained about the presence of hydraulic fluid in pontoons. The record does not contain any evidence that the Government had any specific actual knowledge of the condition alleged by Gonzalez, let alone support for Gonzalez's additional burden of showing that the Government knew the condition was dangerous.

2.    Actual Knowledge of the Contractor's Obviously Improvident Judgment

A plaintiff may satisfy its burden of proof on the vessel's actual knowledge of a condition, but fail to present any evidence that the contractor was obviously improvident in working in the face of the unreasonably dangerous condition. *Nava v. M/V Leonardo Lembo*, No. 01-21276, 2002 WL 31115121, at *1 (5th Cir. 2002) (citing *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1039 n.12 (5th Cir. 1983)). The vessel must have knowledge that the contractor "means to work on in the face of [the

26

unreasonably dangerous condition] and therefore cannot be relied upon to remedy it." *Id.* (quoting *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1245 (5th Cir. 1997)); *Pledger v. Phil Guilbeau Offshore, Inc.*, No. Civ. A. 02-1796, 2003 WL 2012382, at *5 (E.D. La. May 1, 2003) (citing *Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 15 (5th Cir. 1992)). Without evidence that the shipowner cannot rely on the contractor to protect its employees, a plaintiff lacks sufficient evidence to support liability under the duty to intervene.[6] *Keller v. United States*, 38 F.3d 16, 33 (1st Cir. 1994); *Garry v. Exxon Mobil Corp.*, No. Civ. A. 03-0791, 2004 WL 2367706, at *5-6 (E.D. La. 2004); *Wixom v. TGM Shipping Agency*, Civ. A. No. 91-1115, 1992 WL 115612, at *3 (E.D. La. 1992).

The Fifth Circuit noted that the general formulation of the duty to intervene presents a difficulty in "discerning what must be shown to demonstrate that a shipowner had actual knowledge of a [contractor's] 'obviously improvident judgment' such that the shipowner could not rely on the [contractor] to protect its employees." *Greenwood*, 111 F.3d at 1248-49 (internal quotations omitted). A contractor's judgment is obviously improvident when it continues work in the face of a dangerous condition that is so hazardous that anyone can tell that its continued use creates an unreasonable risk of harm. *McCall's Boat Rentals, Inc.*, 227 Fed. Appx. at 405; *Greenwood*, 111 F.3d at 1249; *Woods v. Sammisa Co.*, 873 F.2d 842, 847 (5th Cir. 1989); *Randolph*, 896 F.2d at 971; *Romero v. Cajun Stabilizing Boats, Inc.*, 501 F. Supp. 2d 816, 824 (W.D. La. 2007).

---

[6] The Seventh Circuit has stated this reliance principle as follows: "Even if the defendant . . . regarded a longshoreman 'as no better than a sheep wandering about the ship with no rational concern for his own safety,' it was entitled to regard the stevedore as his principal shepherd." *United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba*, 683 F.2d 1022, 1028 (7th Cir. 1982).

a)     Situations Supporting a Finding of the Vessel's Knowledge of the Contractor's Obviously Improvident Judgment

A vessel has actual knowledge of the obviously improvident judgment of a contractor where the contractor asked the vessel owner to clean a patch of oil, the vessel responded that it would do so shortly, but the contractor continued to work before the vessel had cleaned up the oil patch. *Turner v. Costa Line Cargo Services, Inc.*, 744 F.2d 505, 511 (5th Cir. 1984). A vessel also had the requisite knowledge of a contractor's obviously improvident judgment where the shipowner knew that a crane had recently malfunctioned and needed repairs and the crane was now malfunctioning again. *Greenwood*, 111 F.3d at 1249 n.14 (citing *Hernandez*, 841 F.2d at 586); *see also Hunter v. Reardon Smith Lines, Ltd.*, 719 F.2d 1108, 1111 (11th Cir. 1983). In this situation, the shipowner was in a position to veto the contractor's obviously improvident position of continuing to work using the malfunctioning crane that the shipowner knew needed repair. *Greenwood*, 111 F.3d at 1249 n.14 (citing *Hernandez*, 841 F.2d at 586).

Where the evidence establishes that the vessel understood that the absence of netting or stanchions created a serious hazard and it was obviously apparent that the contractor was not using those precautions, the vessel knew that the contractor was exercising obviously improvident judgment. *Woodruff v. United States*, 710 F.2d 128, 130-31 (4th Cir. 1983). Evidence that a condition was "inherently dangerous to nearby personnel" such that the contractor could not remedy the dangerous condition is also evidence of obviously improvident judgment. *Gill v. Hango Ship-Owners/AB*, 682 F.2d 1070, 1075 (4th Cir. 1982); *see Wheelings v. Seatrade Groningen, BV*, 516 F. Supp. 2d 488, 503 (E.D. Pa. 2007). Where marking-off forbidden areas for van drivers was a common practice and an area was clearly unsafe for van drivers yet the vessel knew this area was

not marked-off, a jury could find that the vessel knew the contractor's inaction was obviously improvident. *Sindicich v. M Highway*, No. 93-56323, 1995 WL 72306, at \*1-2 (9th Cir. Feb. 21, 1995). If the vessel and the contractor were both involved in the inspection of a condition and determined together that it was safe to continue work, there may be a material dispute as to whether the contractor's actions were "obviously improvident." *Randolph v. Laeisz*, 896 F.2d 964, 971 (5th Cir. 1990).

b)     Situations Failing to Support a Finding of the Vessel's Knowledge of
the Contractor's Obviously Improvident Judgment

Where the contractor remedied a situation and the plaintiff failed to show that the contractor's remedy of the situation was obviously improvident, the duty to intervene is not implicated. *Gable v. Klaipeda Transport Fleet, Ltd.*, Civil Action No. 1:04cv581WJG-JMR, 2006 WL 1972238, at \*6 (S.D. Miss. July 12, 2006); *see Queiro v. United States*, No. 85 CV 1459, 1987 WL 6481, at \*3 (E.D.N.Y. Jan. 30, 1987) (finding that a plaintiff provided no evidence to demonstrate the vessel could not rely on the contractor to clean up an oil spill). Evidence that the contractor's remedy of a condition was a common practice for a recurring hazard undermines an attempt by a plaintiff to show that the contractor's judgment was obviously improvident. *Gable*, 2006 WL 1972238 at \*6; *Sinagra v. Atlantic Ocean Shipping, Ltd.*, 182 F. Supp. 2d 294, 304-05 (E.D.N.Y. 2001); *see Clay v. Daiichi Shipping*, 74 F. Supp. 2d 665, 674 (E.D. La. 1999) (holding that the plaintiff failed to explain how the vessel should have known that the contractor's use of standard  methods was an exercise of obviously improvident judgment); *Dembroski v. Reliant Shipping Corp.*, Civil. No. 5-93-110, 1994 WL 903263, at \*4 (D. Minn. Oct. 25, 1994) (same); *Cohen v. United States*, No. CIV. A. 92-3374, 1993 WL 45080, at \*3-4 (E.D. Pa. Feb. 16, 1993);

29

*McGann v. Compania De Navegacio Maritima Netumar*, 586 F. Supp. 1568, 1571 (D. Md. 1984). The plaintiff must also show that the contractor intended to work on through the hazard and was, in fact, not stopping to remedy the hazard. *See Theriot v. Dawson Prod. Services, Inc.*, No. CIV. A. 97-1900, 1998 WL 637384, at *7 (E.D. La. Sept. 16, 1998).

Where no accident or complaint ever arose as a result of a condition, even a dangerous condition, there is no evidence of any obvious improvidence on the part of the contractor. *Keller v. United States*, 38 F.3d 16, 33 (1st Cir. 1994); *Bonds v. Mortensen & Lange*, 717 F.2d 123, 128 n.4 (4th Cir. 1983); *Cole v. Noble Drilling Corp.*, No. CIV 1:05CV479HSO-JMR, 2007 WL 2475944, at *13 (S.D. Miss. Aug. 28, 2007); *Romero v. Cajun Stabilizing Boats, Inc.*, 501 F. Supp. 2d 816, 825 (W.D. La. 2007); *Harris v. Pacific-Gulf Marine, Inc.*, 967 F. Supp. 158, 164-65 (E.D. Va. 1997); *Burns v. D. Oltmann Marine PTE Ltd.*, 901 F. Supp. 203, 208 (E.D. Va. 1995); *Davis v. United States*, 827 F. Supp. 1576, 1579-80 (S.D. Ga. 1993);No. CIV. A. 92-3374, 1993 WL 45080, at *6-7 (E.D. Pa. Feb. 16, 1993); *Dupre v. Chevron U.S.A., Inc.*, Civ. A. No. 91-2039, 1992 WL 176143, at *3 (E.D. La. July 13, 1992); *McGann v. Compania De Navegacio Maritima Netumar*, 586 F. Supp. 1568, 1571 (D. Md. 1984).  Evidence that equipment had been used continually and safely for many years also demonstrates the reasonableness of using the equipment.  *Gill v. Hango Ship-Owners/AB*, 682 F.2d 1070, 1075 (4th Cir. 1982).  Even where there is a possible dangerous condition, if that condition is not obvious and the vessel was not made aware of the condition, there is no actual knowledge on the part of the shipowner that a dangerous condition posed an unreasonable risk of harm. *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1249 n.14 (5th Cir. 1997); *Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 116 (5th Cir. 1981); *see Mullen v. Hoyu Kaiun Kabushiki Kaisha*, CIV. A. No. 88-8311, 1990 WL 55090, at *3-4 (E.D. Pa. Apr. 27, 1990);

*Matthews v. Lykes Bros. S.S. Co., Inc.*, No. CV 83-6699-DWW (KX), 1987 WL 16506, at *14 (C.D. Cal. Feb. 26, 1987).

> c)       Application to Work Conducted in the SBX-1 Pontoons

Gonzalez presented evidence that Harvey knew: (i) hydraulic fluid had collected around valves in the pontoons; (ii) the hydraulic fluid was routinely cleaned up; and (iii) that Harvey never reported the presence of hydraulic fluid to Boeing or any person aboard the SBX-1. There is no evidence that there were any complaints or injuries as a result of hydraulic fluid in the pontoons. There is no evidence that the remedy used by Boeing, AmFELS or IWS in wiping up the hydraulic fluid was not the standard procedure for cleaning up hydraulic fluid spills or an unreasonable method for remedying such spills. Gonzalez presented no evidence that Boeing, AmFELS or IWS intended to allow a worker to continue working in an area where hydraulic fluid was a hazard. The only time Harvey testified that he saw a significant amount of hydraulic fluid, which could be construed as a dangerous amount of fluid, the fluid was being cleaned up. There is not any evidence in the record to alter the Government's ability to rely on the contractors to perform their work safely. Gonzalez, thus, has not provided any evidence from which this Court could make a finding that the contractors were exercising obviously improvident judgment or that the Government knew that the contractors were using such judgment.

> 3.      The *Futo* Factors

The Fifth Circuit outlined additional factors for a court to consider when deciding whether the duty to intervene exists: (1) whether the danger was open and obvious; (2) whether the danger was located within the ship or the ship's gear; (3) which party created the danger or used the defective item and was, therefore, in a better position to correct it; (4) which party owned and

controlled the defective item; (5) whether an affirmative act of negligence or acquiescence in the use of the dangerous item occurred; and (6) whether the shipowner assumed any duty with regard to the dangerous item. *Casaceli v. Martech Int'l, Inc.*, 774 F.2d 1322, 1328 (5th Cir. 1985) (outlining the factors set out by the Fifth Circuit in *Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209, 218, 221 (5th Cir. 1984)).

The first factor, whether the danger was open and obvious, weighs against finding a duty to intervene when the condition, if it was detectable at all, was obvious to the plaintiff and not the defendant. *Prestenbach v. Chios Challenge Shipping & Trading S.A.*, No. Civ. A. 03-3636, 2005 WL 517445, at *8 (E.D. La. Feb. 24, 2005); *Dembroski v. Reliant Shipping Corp.*, Civ. No. 5-93-110, 1994 WL 903263, at *5 (D. Minn. Oct. 25, 1984). Here, the condition was either open and obvious only to Gonzalez or not open or obvious to anyone. Gonzalez testified it was the latter. Either way, the first factor weighs in favor of finding no duty to intervene.

The second factor focuses on the location of the allegedly dangerous condition. *Casaceli*, 774 F.2d at 1328. When hydraulic fluid leaked from a contractor's forklift, the fluid spill was "not part of the ship's normal gear which the owner created or controlled." *Prestenbach*, 2005 WL 517445 at *9 (citing *Cascaeli*, 774 F.2d at 1331). The allegedly dangerous condition was not the valves, but rather hydraulic fluid on a beam in the pontoons. Clean-up of the pontoons was the responsibility of the contractors. The hydraulic fluid was, thus, located in an area where the contractor bore the responsibility rather than the Government, and this factor also weighs against finding a duty to intervene.

The third factor looks to the party that created the danger. *Casaceli*, 774 F.2d at 1328. This factor weighs against finding a duty to intervene when there is no evidence that the vessel had

32

knowledge that the contractor lacked the ability to correct the condition. *Prestenbach*, 2005 WL 517445 at *9. Where the vessel is completely removed from the operations and equipment involved, the contractor is clearly in the better position to correct the condition. *Dembroski*, 1994 WL 903263 at *6. Here again, the contractors were responsible for clean-up and were in the best position to remedy any potential hydraulic spill. There is no evidence that the Government knew AmFELS, IWS, or Boeing lacked the ability to remedy spilled hydraulic fluid. Further, there is no evidence the Government had any involvement in the clean-up of hydraulic fluid in the pontoons. This factor weighs against finding a duty to intervene. The fourth factor, which party controlled the area and/or the dangerous condition involved, also weighs against finding a duty to intervene as the Government had no control or responsibility over the clean up of hydraulic fluid in the pontoons. *See Prestenbach*, 2005 WL 517445 at *10; *Dembroski*, 1994 WL 903263 at *6.

Where plaintiff's theory of liability rests on the vessel's failure to clean the fluid off the deck rather than on an affirmative negligent act, the fifth *Futo* factor weighs against a finding of a duty to intervene. *Prestenbach*, 2005 WL 517445 at *10; *Dembroski*, 1994 WL 903263 at *6. The Government's only alleged negligence in this action is based on an omission—the Government's alleged failure to clean up the hydraulic spill—rather than the Government actually creating the spill. This factor further weighs against the duty to intervene. As to the sixth factor, there must be evidence that the vessel assumed a duty with respect to the condition or the instrumentality creating the condition to satisfy the sixth factor. *Prestenbach*, 2005 WL 517445 at *10; *Dembroski*, 1994 WL 903263 at *6. There is no evidence the Government ever assumed a duty with respect to cleaning up hydraulic fluid in the pontoons. Overall, all of the *Futo* factors weigh against finding a duty to intervene.

33

4.      Conclusion

Gonzalez failed to provide evidence that the Government had either: (i) actual knowledge of the existence of a dangerous condition or (ii) actual knowledge of any obviously improvident judgment by the contractors.  Further, the *Futo* factors weight against finding a duty to intervene. Gonzalez has, thus, failed to establish the existence of a genuine issue of fact regarding essential elements of his duty to intervene claim.  The Government's Motion for Summary Judgment on Gonzalez's duty to intervene claim is **GRANTED**.

F.      <u>Seaworthiness Claim</u>

The LHWCA does not permit recovery from a vessel under a warranty of seaworthiness.  33 U.S.C. § 905(b); *Futo v. Lykes Bros. S.S. Co.*, 742 F.2d 209, 212 (5th Cir. 1984).  The Government's Motion for Summary Judgment on Gonzalez's claim of seaworthiness is **GRANTED**.

VI.     CONCLUSION

The Court has granted summary judgment to the Government on all of Gonzalez's claims. The Government's motion for summary judgment is **GRANTED**.

Signed, this 17th day of June, 2008.


Andrew S. Hanen
United States District Judge

34